# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBIN MCKEON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 22-10812-MJJ |
| | ) |
| ROBERT REISER & CO., INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF DECISION

March 12, 2025

JOUN, D.J.

Plaintiff Robin McKeon ("Ms. McKeon") brings twelve claims against her employer, Robert Reiser & Co., ("Defendant," "Reiser," or "the Company"), alleging employment discrimination on the basis of her disability in violation of M.G.L. ch. 151B, § 4 ("Chapter 151B") and the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101, *et seq.*, violations of the Massachusetts Paid Family and Medical Leave Act, ("PFMLA"), M.G.L. ch. 175M, the Family and Medical Leave Act, ("FMLA"), 29 U.S.C. § 2601 *et seq.*, claims of retaliation in response to Plaintiff raising Defendant's alleged violation of the foregoing statutes, and claims of retaliation in violation of the Massachusetts Equal Pay Act, ("MEPA"), M.G.L. c. 149, § 105A, the Federal Equal Pay Act, ("EPA"), 29 U.S.C. § 218c, and retaliation on the basis of sex in violation of Chapter 151B.[1] [Doc. No. 42-1 ("Second Amended Complaint")].

---

[1] Ms. McKeon agreed to voluntarily dismiss her claims alleging direct violations of MEPA, EPA, and Chapter 151B, (Counts I, III & V of the Second Amended Complaint), which were based on her allegations that Defendant provided higher salaries and enhanced benefits to male Regional Managers,

These causes of action arise out of various incidents that took place between Ms. McKeon and management at Reiser between 2021 and 2023. In essence, Ms. McKeon claims she was denied a remote work reasonable accommodation request due to her medical conditions of anxiety and agoraphobia, and that due to this denial, she was forced to use PFMLA or FMLA leave. Ms. McKeon alleges that being forced to use leave and supplement her income with earned sick and vacation time, the denial of her accommodation request, and written disciplines she received for unexcused absences, all constitute retaliation and hostility. Ms. McKeon also alleges that the Company retaliated against her for raising her now-dismissed equal pay act claims.

Before me is Defendant's Motion for Summary Judgment. [Doc. No. 53]. As explained below, most of Plaintiff's claims do not have merit; however, Ms. McKeon has demonstrated that a genuine dispute of fact exists as to her hostile work environment claim, which arises from two incidents that involve the objectification of women. A jury is best suited to determine whether Ms. McKeon's hostile work environment claim will prevail. Thus, Defendant's Motion is <u>GRANTED</u>, in part, as to all counts except for Plaintiff's hostile work environment claim in Count XV, to which Defendant's Motion is <u>DENIED</u>.

I.    **BACKGROUND**

The following facts are taken from the parties' Consolidated Statement of Facts, [Doc. No. 74], exhibits to Defendant's Motion, [Doc. No. 58], and exhibits to Plaintiff's revised Opposition, [Doc. No. 66-2]. The below facts are undisputed unless otherwise noted.

without compensating Plaintiff for similar work she performed. [*See* Doc. No. 52]. Ms. McKeon also agreed to the partial dismissal of her employment discrimination and retaliation claims (Counts VII, VIII, IX & X of the Second Amended Complaint), to the extent they relate to Defendant's alleged failure to accommodate Ms. McKeon's dog as a service animal, threatening discipline thereto, and any related retaliation claim. [*Id.*]. Accordingly, I will not consider any exhibits or arguments pertaining to Ms. McKeon's service animal.

### A.    Ms. McKeon's Employment & Duties At Reiser

Reiser is a family-owned company based in Canton, MA, that supplies processing and packaging equipment for the sausage, meat, poultry, seafood, prepared food, bakery, and cheese industries. [Doc. No. 74 at ¶¶ 1-2]. Roger Reiser is an owner and former president of Reiser. [*Id.* at ¶ 3]. Since November 2013, Ms. McKeon has been the Sales Administrator for Reiser's west coast regional sales team and was based out of Reiser's Canton, MA Office. [*Id.* at ¶ 6].

As a Sales Administrator, Ms. McKeon's supervisor is the West Coast Regional Manager. [*Id.* at ¶ 8]. Ms. McKeon's role is administrative in nature and involves supporting the West Coast Regional Manager by performing the following responsibilities and duties, as listed in the Sales Administrator Job Posting and Position Description: "Manage information flow in a timely manner," "Prepare sales documents . . . and draft quotes," "Answering phones and routing to appropriate person/department," "Retrieving and filing records, documents and reports," "Create machine file and log into machine book," "Printing and filing all service tickets as they are approved," "All general filing in the Canton office," and "Answer phones for senior receptionist as needed." [*Id.* at ¶¶ 9-10; Doc. No. 58-11; Doc. No. 58-12]. The parties dispute the extent to which Ms. McKeon's responsibilities include providing front desk coverage when the receptionist, Helen Graham, is unavailable. [Doc. No. 74 at ¶ 81]. Ms. McKeon states that she did not always provide front desk support, that a different sales administrator covered the front desk regularly when Ms. Graham was at lunch, and that all the sales administrators rotated front desk coverage if Ms. Graham was on vacation. [*Id.*].

Ms. McKeon's responsibilities also include accessing and maintaining "Machine Files," which are hard copy files contained in filing cabinets at the Canton office. [*Id.* at ¶ 11]. Ms. McKeon was required to access Reiser's Machine Files whenever a member of the west coast

3

sales team called to request it. [*Id.* at ¶ 82]. This responsibility required her to be in the office to access the file. [*Id.*]. Access to the Machine Files is part of Reiser's normal business practices and other departments rely on the file to be in the office so that they can access the file. [*Id.* at ¶ 83]. At any time, a service manager or sales manager, or any Reiser employee, may go to the in-office filing cabinets to pull a Machine File to review. [*Id.* at ¶ 84]. When someone needs a Machine File, it is typically because a customer's machine is down, and waiting to access the file is not consistent with the customer service model at Reiser, where people would get on a plane and drop off parts overnight to keep a customer running. [*Id.*].

Additionally, Ms. McKeon was responsible for preparing the "White Sheet," a physical document that a Sales Administrator prepares and files in the Machine File. [*Id.* at ¶ 12]. Ms. McKeon states that she maintains Machine Files in PDF form on her computer, but Reiser disputes this and maintains that she only keeps a PDF of the "White Sheet." [*Id.* at ¶ 190]. All sales administrators and other employees may access Machine Files. [*Id.* at ¶ 191]. Ms. McKeon was also responsible for printing documents. [*Id.* at ¶ 13]. The parties dispute whether most or much of Ms. McKeon's work is done by computer or email. [*Id.* at ¶ 193]. Prior to the COVID-19 pandemic, Ms. McKeon worked in the Canton office from Monday through Friday, 8:30 a.m. to 5:00 p.m. [*Id.* at ¶ 14].

### a. In 2019, Ms. McKeon Took On Increased Responsibilities And Received A Pay Raise

Ms. McKeon reported to David Andronico, West Coast Regional Manager, from the time she was hired until Mr. Andronico's retirement in early 2019. [*Id.* at ¶ 15]. During this time, Mr. Andronico would delegate some of his duties as regional manager to Ms. McKeon that he did not delegate to other Sales Administrators. [*Id.* at ¶ 194]. After Mr. Andronico retired, Ms. McKeon did not apply for a regional manager position. [*Id.* at ¶ 16]. On July 9, 2019, Mario Serafin was

hired to fill Mr. Andronico's role as Regional Manager. [*Id.* at ¶ 17]. In October 2019, after viewing Mr. Serafin's offer letter, Ms. McKeon applied for the position of Regional Manager. [*Id.* at ¶¶ 17-18]. On October 21, 2019, Ms. McKeon emailed Mr. Reiser to inform him that she applied for a Regional Manager position. [*Id.* at ¶ 20]. On October 22, 2019, Mr. Reiser responded that he was not aware that the Company was looking for a Regional Manager at that time, but wrote to Ms. McKeon that "[t]he job that you are doing taking care of the West Coast has not gone unnoticed and Wayne B[ryant] and I welcome the opportunity to sit down with you in the near future to discuss your thoughts and ideas." [*Id.* at ¶¶ 20, 23; Doc. No. 58-9].

On November 12, 2019, Ms. McKeon wrote a letter to Mr. Reiser expressing her concerns that she had been performing the duties of a Regional Manager since Mr. Andronico's retirement and that she was the only female performing these duties while being compensated significantly less than other Regional Managers. [Doc. No. 74 at ¶¶ 24, 198; Doc. No. 58-10]. On November 30, 2019, Ms. McKeon met with Mr. Reiser and Wayne Bryant, then Senior Vice President of Sales, at which time she was informed she would receive a salary increase; Ms. McKeon was satisfied with the salary increase. [Doc. No. 74 at ¶ 25]. Effective January 1, 2020, Ms. McKeon received a $10,319.92 (14.81%) salary increase, bringing her total salary to $79,999.92. [*Id.* at ¶ 26].

### b. Ms. McKeon's Lawsuit Related To Her Unequal Pay Claims & Subsequent Loss Of Access To Mr. Serafin's Calendar And Sales Spreadsheet

Two years later, on February 23, 2022, Ms. McKeon filed a Complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging sex-based discrimination and retaliation relative to her compensation.[2] [*Id.* at ¶ 66]. On April 21, 2022, Ms.

---

[2] On September 9, 2022, Ms. McKeon filed a Motion to Amend her Complaint to the MCAD to add discrimination on the basis of disability and retaliation. [Doc. No. 74 at ¶ 248].

McKeon filed a Complaint in Norfolk Superior Court alleging the same claims. [*Id.* at ¶ 88]. After filing her lawsuit, Mr. Serafin removed Ms. McKeon's full access to his personal calendar, which did not impact her ability to do her work. [*Id.* at ¶¶ 89, 90, 196]. Ms. McKeon also claims that her access to a sales tracker spreadsheet was taken away after the filing of her lawsuit. [*Id.* at ¶ 197]. Defendant asserts that Mr. Serafin used a different process to track sales. [*Id.*].

**B.     Ms. McKeon's Post-Pandemic Hybrid Schedule From September 2021 to December 2021**

From approximately March 2020 to September 2021, the west coast team worked primarily remotely due to the COVID-19 pandemic. [*Id.* at ¶ 31]. During this time, the Company had an arrangement where Ms. McKeon would periodically pick up or return Machine Files to the office as needed. [*Id.* at ¶ 32]. Additionally, Ms. McKeon answered phones remotely for Ms. Graham during the pandemic. [*Id.* at ¶ 227]. In July 2020, Plaintiff moved to Coventry, Rhode Island, a 52-mile commute to the Canton office. [*Id.* at ¶ 33]. On September 14, 2020, Ms. McKeon's mother moved to a rehabilitation center in South Easton, Massachusetts, which is approximately 12 miles from the Canton office. [*Id.* at ¶ 34]. As of Labor Day 2021, Reiser's Canton office required staff to return to office in-person five days a week. [*Id.* at ¶ 38]. Ms. McKeon did not want to return to full-time work because she wanted flexibility to take care of her mother who was suffering from end stage Parkinson's disease. [*Id.* at ¶¶ 39, 206]. This flexibility would also help relieve the emotional toll and anxiety Ms. McKeon was suffering from dealing with her mother's ongoing care. *Id.* McKeon also did not want to commute from Coventry, Rhode Island to the Canton Office every day. [*Id.*].

On September 9, 2021, in response to a request from Ms. McKeon, Bob Berry, Reiser's Benefits Analyst, sent Ms. McKeon an email with detailed information regarding options for Ms. McKeon if she needed to take a leave of absence, including an option of applying available sick,

extended sick leave, and/or accrued vacation days to bring Ms. McKeon to 100% of her pay. [*Id.* at ¶¶ 40-41; Doc. No. 58-19].[3] After receiving this email, Ms. McKeon did not elect to take medical leave in September 2021 and neither requested nor declined to use paid sick or vacation time to augment that leave. [Doc. No. 74 at ¶ 209]. Rather, Ms. McKeon met with Ms. Reiser to request an alternative arrangement. [*Id.* at ¶ 43]. On September 13, 2021, Ms. McKeon sent Mr. Reiser a follow-up email proposing a hybrid work schedule, stating that "taking a leave through the Family Medical Leave Act (FMLA) is not a good option." [*Id.* at ¶¶ 43, 210; Doc. No. 58-20]. On September 16, 2021, Mr. Serafin emailed Ms. McKeon with an alternative, hybrid schedule to be in place until December 13, 2021, pursuant to which Ms. McKeon would work remotely two days a week and would work in the Canton Office three days a week with a 3-hour break to visit her mother during the day and then return to work at the Canton Office. [Doc. No. 74 at ¶ 46; Doc. No. 58-21]. In response to that email on September 17, 2021, Ms. McKeon indicated that "M-W-F works for me. I will be in early each day, as I always have been. Don't usually need 3 hours, she gets too tired if I stay more than 1 hour. Thanks for the understanding and cooperation during this nightmare." [Doc. No. 58-21]. Ms. McKeon argues that during this hybrid schedule, she was able to do her job and go in the office "off-hours" to make copies of documents. [Doc. No. 74 at ¶ 212]. Reiser disputes this and states that Mr. Serafin testified they had "difficulty" when Ms. McKeon worked remotely because "there were days where [machine] files were not in the office." [*Id.*].

---

[3] Ms. McKeon disputes this fact and contends that she did not ask to take medical leave, but rather Mr. Berry was told to send her leave information in case she needed to take time off from work. This is a distinction without a difference. The record is clear that Ms. McKeon initiated a conversation with Reiser about her personal situation that caused Mr. Berry to send her information about taking a leave of absence. [*See* Doc. No. 58-56, at Pl. Tr. Vol. II 28:10-19; 30:21-24; 31:1-17 ("Q: But you would agree with me he didn't just send this out of the blue. This is something you had asked of Reiser? A: I'm sure, yes")].

On December 13, 2021, the day that Ms. McKeon's hybrid schedule was scheduled to end, and she was expected to return full-time to the office, Mr. Berry sent Ms. McKeon an email stating that he received an email from Symetra, a third-party administrator, requesting information regarding intermittent leave that Ms. McKeon requested. [Doc. No. 58-22]. The parties again dispute whether Ms. McKeon requested intermittent leave submitted to Symetra, or whether the December 13, 2021 email was an extension of the September 9, 2021 email that Mr. Berry originally sent Ms. McKeon regarding leave information. [*See* Doc. No. 74 at ¶ 51; Doc No. 58-22 at 3-4]. Ms. McKeon responded to Mr. Berry's December 13, 2021 email stating, "I have been leaving the office to deal with my mom's care for a while, with approval of my regional manager. Not really sure how to answer this question since I still plan to work as much as I can and keep up with my work." [Doc. No. 58-22]. Mr. Berry responded and explained that "[i]t is just for leave tracking purposes. I will put today as the start date, so anytime going forward that you take off to care for your mom you will have to let both Symetra and I know so we can track your leave time." [*Id.*]. That same day, Mr. Berry followed up and further explained that Ms. McKeon did not actually need to report anything until her leave was approved. [*Id.*].[4] Ms. McKeon responded and said, "Ok, hoping that this is not too inconvenient for you. Thank you for the direction." [*Id.*].

The record shows that Ms. McKeon was prepared to use leave from January 2022 to June 2022. [*See* Doc. No. 58-56, at Pl. Tr. Vol. II 46:1-11 ("Q: So, at this point in time in December of 2021, your testimony is that, at this time, you're prepared to actually use intermittent FMLA and PFML? A: That is true. That is true, yes. Q: So you weren't angry about that? A: No. No.");

---

[4] At Reiser, leaves under the FMLA and PFMLA are approved by the third-party administrator, not the employee's manager. [Doc. No. 74 at ¶ 52].

47:2-8 ("Q: Just to be clear, you were perfectly happy to use your leave time beginning in January of 2022. That is your testimony? A: I believe so, yes")].

On December 27, 2021, Ms. McKeon's counsel sent Mr. Reiser a letter alleging sex-based discrimination and retaliation relative to Ms. McKeon's claims that she had performed the work of a Regional Manager. [Doc. No. 74 at ¶ 55; Doc. No. 58-24].

### C.  Ms. McKeon's Return To Work And Subsequent Leave Under FMLA and PFMLA From January 2022 to June 2022

On January 5, 2022, Symetra notified Ms. McKeon that her request for intermittent leave under the FMLA and PFMLA was approved for the "care of a family member" from January 1, 2022, to June 30, 2022. [Doc. No. 74 at ¶ 56]. From January 2022 to the present, Ms. McKeon was never denied requested leave time under the FMLA or PFMLA. [*Id.* at ¶¶ 57-58]. Ms. McKeon understood that, except when using intermittent leave time to care for her mother, Reiser's expected McKeon to work in the Canton Office. [*Id.* at ¶ 59]. On March 2, 2022, Mr. Serafin sent Ms. McKeon an email informing her that when she was out on leave under the FMLA, she should not be working. [*See* Doc. No. 58-25 ("As always, please take all the FMLA time you need to care for your mom, including this entire week as you requested. But if you've told me that you're not coming into the office, there is no need for you to log in remotely or answer phone calls from sales guys. . . . I want you to focus on your family when you're using fmla and not work.")].

Ms. McKeon took intermittent leave in January and February 2022, and then continuous leave from February 2022 through June 2022 as she "felt it necessary" for her own medical condition. [Doc. No. 74 at ¶¶ 61-63]. During her leave time, Ms. McKeon received her fully weekly wages and adjustments would be made to her available vacation and sick time to supplement her income while on leave. [*Id.* at ¶ 64].

### a. Ms. McKeon's Accommodation Requests For Her Own Well-Being Made During Her Leave Taken Between January 2022 and June 2022

#### i. The March 2022 Accommodation Request

On March 21, 2022, Ms. McKeon requested via email to work remotely from 2:00 pm to 7:00 pm Monday to Friday, for the near future. [*Id.* at ¶ 67]; Doc. No. 58-26]. On March 22, 2022, Mr. Serafin responded to the request, indicating that he understood this to be a request related to the care of her mother, encouraging Ms. McKeon to take all the FMLA time she needed, but explaining that her requested remote schedule will not work due to the importance of in-office work for the Sales Administrator role. [Doc. No. 74 at ¶ 67]. On March 24, 2022, Ms. McKeon responded and explained that she was requesting this remote schedule for her "own emotional well-being," explaining that she had "developed some medical issues" stemming from "having NO diversion from the life that I live with my mother, since I am unable to work remotely, per your direction." [Doc. No. 58-26]. In connection with this request, Ms. McKeon provided a form from her healthcare provider. [*See* Doc. No. 58-27]. This form stated that Ms. McKeon did not have an impairment that limits her ability to perform her work and that Ms. McKeon was "able to complete duties but should be allowed to work virtually part-time." [Doc. No. 74 at ¶ 69; Doc. No. 58-27; Doc. No. 58-28]. On March 31, 2022, based on her healthcare provider's determination that Ms. McKeon did not have an impairment that limits her ability to perform the essential functions of her job, Reiser denied Ms. McKeon's request to work remotely. [Doc. No. 74 at ¶ 70; Doc. No. 58-28]. Ms. McKeon agrees that Reiser's denial was appropriate. [Doc. No. 74 at ¶ 70].

#### ii. The April 2022 Accommodation Request

On April 1, 2022, Ms. McKeon's Psychiatric Nurse Practitioner Christine Paleczny, who was treating Ms. McKeon for Generalized Anxiety Disorder and Agoraphobia, provided Reiser

with a professional recommendation that Ms. McKeon work from home for the next 6 months. [*See* Doc. No. 58-29]. On April 4, 2022, Reiser asked Ms. Paleczny to fill out the same form provided by Ms. McKeon's healthcare provider in March 2022, and gave Ms. Paleczny the job description setting forth the essential functions of the sales administration job. [*Id.*; *see also* Doc. No. 58-27]. When Ms. Paleczny filled out the form, she indicated that Ms. McKeon has a temporary impairment that limits her ability to perform her job for about "6 months or more," and requested that Reiser "allow employee to work from home." [Doc. No. 58-29]. On April 19, 2022, Ms. McKeon received a letter from Patti Bray, Reiser's HR Business Partner, which identified essential functions for the Sales Administrator role and denied Ms. McKeon's full-time remote work request "because the essential functions of [Ms. McKeon's] job duties require [her] to be physically present in the office." [*See* Doc. No. 58-30; Doc. No. 74 at ¶¶ 78-80, 85]. Ms. McKeon did not perform a number of the duties listed in Ms. Bray's letter and answered phone calls rarely. [Doc. No. 74 at ¶ 216]. The only specific duty mentioned in the letter that required Ms. McKeon's physical presence was maintaining and filing customer and machine files. [*Id.*].

The letter detailed alternative accommodations, which Ms. McKeon and Ms. Bray had previously discussed during a phone conversation on April 12, 2022. [Doc. No. 58-30]. These alternatives included providing noise cancelling headphones, moving the location of Ms. McKeon's desk to a quieter area, allowing Ms. McKeon to leave the office if emergencies arose relating to Ms. McKeon's mother, and minor adjustments to Ms. McKeon's daily schedule, such as starting an hour early or leaving an hour early. [Doc. No. 58-30; Doc. No. 74 at ¶ 86]. Ms. Bray invited Ms. McKeon to contact her to discuss the proposed alternative accommodations, but Ms. McKeon did not follow-up on that offer. [Doc. No. 74 at ¶ 87]. The letter encouraged

Ms. McKeon to use all of her "remaining FMLA time so that you may provide necessary care for your mom, whenever the need arises." [Doc. No. 58-30 at 4]. With regard to the alternative options, Ms. Bray did not specify a particular location where Ms. McKeon could work. [Doc. No. 74 at ¶ 217]. Rather, Ms. McKeon was told to find a location herself and management would tell her if it would work. [*Id.*]. Additionally, Ms. McKeon testified that the noise cancelling headphones "don't cancel anything completely." [Doc. No. 58-56 at 96:15].

D.   **The May 2022 Request For Leave**

On May 18, 2022, at her request, Mr. Berry emailed Ms. McKeon with information regarding taking another leave of absence. [Doc. No. 74 at ¶ 91]. In the May 18, 2022, email, Mr. Berry again explained that Reiser could apply available sick leave or vacation time to bring Ms. McKeon to 100% of her pay, which is what Ms. McKeon wanted Reiser to do. [*Id.* at ¶ 92; Doc. No. 58-31]. Reiser did not prevent Ms. McKeon from taking a leave in May 2022, and by late June 2022, Ms. McKeon used all 470 hours of her approved leave time. [Doc. No. 74 at ¶¶ 93, 96].

E.   **Ms. McKeon's Return To Work In-Person From June 2022 to August 2022**

a.   **First Schedule Modification Upon Return To Work**

On June 17, 2022, Ms. McKeon emailed Mr. Berry, Ms. Bray, and Mr. Serafin, in anticipation of her return to work, proposing the following hours, all at Reiser's Canton Office: Monday, Wednesday, and Friday from 7:00 am until 4:00 pm, working through lunch, and Tuesday and Thursday from 7:00 am until 1:00 pm, to "allow [her] to continue to provide the care and visits necessary for both Mom and [herself]." [Doc. No. 74 at ¶ 98; Doc. No. 58-33]. On June 22, 2022, Bob Fontaine, Reiser's then recently hired VP of HR, emailed Ms. McKeon and reiterated the reasons why Ms. McKeon's accommodation request would not work. [Doc. No. 74

at ¶ 100; Doc. No. 58-32]. Mr. Fontaine stated that "although it does create a hardship for the department in serving the west coast territory," they could offer Ms. McKeon "an accommodation in work schedule 8:00 am – 4:30 pm (with a 1-hour lunch break)" through August 26, 2022 after which they would assess the effectiveness of that work schedule. [Doc. No. 58-32]. Mr. Fontaine stated that "no other sales admin in any sales region has such a schedule." [*Id.*; Doc. No. 74 at ¶ 222]. Another Sales Administrator, Penny Taylor works a reduced schedule, for reduced compensation, pursuant to which she does not work on Fridays, and all other days she works in the Canton office. [Doc. No. 74 at ¶¶ 102, 223].

Upon return to work, Ms. McKeon's schedule was adjusted by an hour, which helped to address Ms. McKeon's longer commute due to her move to Coventry, Rhode Island. [*Id.* at ¶ 104]. Ms. McKeon argues that she implemented her own accommodations by using the noise cancelling headphones, and the parties dispute the extent to which Ms. McKeon was able to perform her job functions, with Reiser arguing that Ms. McKeon was able to perform all essential functions from her cubical, and Ms. McKeon arguing that she was "mostly" able to perform her work with her own modifications. [*Id.* at ¶ 107].

### b. Dispute Over Front Desk Coverage

In July 2022, Ms. McKeon was asked to cover the front desk. [*Id.* at ¶ 108]. Ms. McKeon responded asking: "Can I answer from my desk? I have very bad issues with a shared workspace at this moment, but do not want to just dump on everyone else." [*Id.* at ¶ 109; Doc. No. 58-34]. Ms. Bray responded that front desk coverage requires that someone sits at the front desk to answer phones and greet visitors but suggested that the front desk be disinfected if the issue was a matter of sanitation. [Doc. No. 74 at ¶ 110; Doc. No. 58-34]. Ms. McKeon did not believe this response was adequate, and the parties dispute whether Ms. Bray properly understood exactly

13

what Ms. McKeon's concerns were with respect to front desk coverage. [Doc. No. 74 at ¶¶ 111-113].

On July 20, 2022, Ms. McKeon had to leave work early due to a massive anxiety attack, and emailed Mr. Fontaine and Mr. Serafin stating "I will gladly work the rest of the week remotely until we can have a meeting to discuss my accommodations, or you can use my vacation time, whichever you need to do." [Doc. No. 74 at ¶ 119; Doc. No. 58-37]. On July 20, 2022, Mr. Fontaine responded: "I understand completely. I think it would be best for you to take the rest of the week off as vacation time, to relax and find any additional comfort you are able." [Doc. No. 74 at ¶ 121; Doc. No. 58-37].

Ms. McKeon was assigned one-hour shifts to cover the front desk on July 27, 28, and 29, 2022. [Doc. No. 74 at ¶ 127]. On July 26, 2022, Ms. McKeon emailed Mr. Fontaine stating: "I have explained that I cannot sit in a common workspace, due to my anxiety." [Doc. No. 74 at ¶ 128; Doc. No. 58-38]. On July 26, 2022, Mr. Fontaine responded that front desk coverage is "part of the job" and asked if Ms. McKeon could "offer any other proposed accommodation that might allow you to do that job from the front desk," stating that "[w]e would like to accommodate if we reasonably can, and we need to make sure the front desk has sufficient coverage." [Doc. No. 58-38; *see also* Doc. No. 74 at ¶¶ 229-230]. The parties dispute whether this was the first time that either Mr. Fontaine or Ms. Bray had been informed that Ms. McKeon's inability to cover the front desk was due to anxiety. [Doc. No. 74 at ¶ 129]. The parties do agree that since July 2022, Ms. McKeon covered the front desk on very rare occasions. [*Id.* at ¶ 130].

### c. Second Schedule Modification Upon Return To Work

On July 26, 2022, Ms. McKeon met with Mr. Fontaine and Mr. Serafin. [*Id.* at ¶ 131]. During their meeting, Reiser agreed to Ms. McKeon's requested modified work schedule pursuant to which she would work at the Canton Office from 7:30 am to 4:00 pm with a 2-hour lunch break on Tuesdays and Thursdays to visit her mother, without the need to take FMLA time. [*Id.*].

### F. McKeon's Calculation Of Available Vacation Time In Fall 2022

On September 23, 2022, Ms. McKeon emailed Mr. Serafin indicating that the only day she knew she was planning to take vacation time was October 19, 2022, for her mother's birthday. [*Id.* at ¶ 133; Doc. No. 58-42]. After a conversation on October 18, 2022, Mr. Serafin allowed Ms. McKeon to take the day off on October 19, 2022, for her mother's birthday. [Doc. No. 74 at ¶ 137; *see also* Doc. No. 58-42]. Though there is some dispute over what request was made regarding Ms. McKeon's request to take time off during Thanksgiving, [*see* Doc. No. 74 at ¶ 138], ultimately on October 31, 2022, Mr. Serafin indicated via email that he did not approve Ms. McKeon's request for unpaid time off for the week of Thanksgiving 2022 because she ran out of paid time off. [Doc. No. 74 at ¶ 139]. In that email, Mr. Serafin warned that "any other time away from work this year will be a disciplinary issue. HR has been involved and informed." [*Id.*; Doc. No. 58-42]. Mr. Serafin did not approve other employees he supervised to take unpaid time off. [Doc. No. 74 at ¶ 140].

On September 29, 2022, Mr. Fontaine emailed Ms. McKeon regarding corrections to her vacation balance adjustments explaining that, because of an error with the PurelyHR software system, which Reiser began using in January 2022 to help employees track their time off balance, Ms. McKeon's use of accrued time off to supplement her income during her leave was

not debited from in her accrued time off balance in PurelyHR. [Doc. No. 74 at ¶ 134]. As a result of this error, Ms. McKeon exceeded her accrued allotment of eligible time off by 8.4 days. [*Id.*]. This error impacted all employees who took leave in 2022. [*Id.*; *see also* Doc. No. 58-43]. Reiser did not seek restitution for the overpayment relative to the 8.4 days. [Doc. No. 74 at ¶ 135]. Ms. McKeon agrees that the amount of time ultimately deducted from her sick and vacation time relative to her leave was correct. [*Id.* at ¶ 136].

On November 17, 2022, Ms. McKeon identified an error in her vacation time calculation on PurelyHR relative to her leave in January through March 2022, which was the result of an "error with the AM/PM toggle in the system" and was corrected immediately. [*Id.* at ¶ 141]. All in all, it is undisputed that Ms. McKeon's only complaint regarding the use of her sick and vacation time to supplement her income while on leave is her claim that Reiser belatedly made the adjustments in the software used by Reiser to her sick and leave time. [*Id.* at ¶ 65].

### G. Ms. McKeon's Renewed Request For Remote Work Between December 2022-June 2023

On March 8, 2023, Ms. McKeon made a request to Mr. Serafin to work remotely on Wednesdays and Fridays, which Mr. Serafin denied, citing the in-person responsibilities necessitated by the sales administrator role. [*Id.* at ¶¶ 143-145; *see also* Doc. No. 58-44].

### H. Mr. Reiser's Birthday Card & The T-Shirt At The Summer Sales Meeting

In July 2023, Sales Administrator Frances Downey asked Ms. McKeon for a picture of herself to include in a birthday card that Ms. Graham was putting together for Mr. Reiser's 80th birthday. [Doc. No. 74 at ¶¶ 146-147]. The card would consist of cutout pictures of Reiser's female employees' faces pasted on cutout pictures of women in bathing suits on poster board. [*Id.* at ¶ 146]. Ms. McKeon initially agreed and provided Ms. Downey with a photograph of herself in funny glasses. [*Id.* at ¶ 147]. Ms. McKeon later requested that Ms. Downey not include

her picture on the card, so her picture was not ultimately included. [*Id.* at ¶ 148]. Ms. McKeon signed the birthday card and took a photograph of the card before she signed it. [*Id.* at ¶¶ 150-151, 237]. The card was displayed in Mr. Reiser's office, which Ms. McKeon could not see from her cubical; however, she could see the card while putting machine files away outside of Mr. Reiser's office. [*Id.* at ¶¶ 152-153, 238]. Ms. McKeon had participated in and assisted with preparing similar birthday cards in the past but testified that she would not want her daughter to participate in this type of activity. [*Id.* at ¶¶ 155, 236].

The 2023 Reiser summer sales meeting took place during the week of July 31, 2023. [*Id.* at ¶ 157]. As part of the meeting, each regional sales team competed to prepare and present a product. [*Id.* at ¶ 158]. In 2023, the west coast sales team's product was the "Camel Toe Burger," an idea derived from a Reiser customer who had a tattoo of a camel on his toe. [*Id.* at ¶¶ 158-159, 241]. Mr. Serafin understood that the term "camel toe" had another meaning pertaining to the female body and thought that was why the joke was funny. [*Id.* at ¶ 242]. Mr. Serafin, with the help of his daughter, created a t-shirt for the west coast sales team to wear as part of its marketing for the product at the summer sales meeting. [*Id.* at ¶ 160]. The expectation was that the entire sales team would wear the t-shirt, and employees did. [*Id.* at ¶ 243]. Ms. McKeon did not attend the 2023 summer sales meeting, was never asked by anyone to wear the t-shirt, and did not see anyone wearing the t-shirt, but claims to have taken a t-shirt, despite believing it was "tasteless," because she has all the "silly" t-shirts from the Reiser summer sales meetings during her tenure at Reiser. [*Id.* at ¶¶ 161-162, 164, 244]. Ms. McKeon also does not remember, but does not deny, saying to Mr. Serafin that her husband would think the t-shirt is funny. [*Id.* at ¶ 163].

### I.    Ms. McKeon's Unexcused Absences Between August 2023 and November 2023

On August 11, 2023, McKeon received a written discipline for not providing adequate notice for a time off request and still taking a day off on August 9, 2023, even though her request was denied by Mr. Serafin. [*Id.* at ¶¶ 171-177; *see also* Doc. No. 58-47; Doc. No. 58-48. On October 31, 2023, Ms. McKeon received another written discipline after she left work early without permission on October 27, 2023. [Doc. No. 74 at ¶¶ 178, 180; *see also* Doc. No. 58-50]. On November 15, 2023, McKeon provided a written response to both written disciplines, explaining that she does not always "need to give advanced notice to use personal earned vacation/sick time," and believes that she was justified in leaving early that day in October because she had informed another colleague that she was leaving. [Doc. No. 58-51; Doc. No. 74 at ¶¶ 184, 246]. She also expressed her reasons for why she believes she has been a good employee at Reiser and stated that these disciplinary actions to her are "an emerging pattern of behavior" and "unmitigated retaliation" [Doc. No. 58-51]. On November 27, 2023, Mr. Fontaine responded to Ms. McKeon's November 15th letter by reiterating Reiser's absence policies and stated that "[r]equiring our employees to adhere to a regular work schedule is not new, and it is certainly not an 'emerging pattern of behavior.'" [Doc. No. 58-52; Doc. No. 74 at ¶ 185].

### J.    Ms. McKeon's Present Employment With Reiser

Throughout this litigation, Ms. McKeon has remained an employee at Reiser. [Doc. No. 74 at ¶¶ 186-189]. Her current hours are 7:30 am to 4:00 pm, with permission to leave from 11:00 am to 1:00 pm on Tuesdays and Thursdays. [*Id.* at ¶ 187]. Ms. McKeon does not presently desire to work fully remote because "being around people is very good for [her] mental health." [*Id.* at ¶ 188]. Ultimately, the parties agree that Ms. McKeon has performed her job capably since

returning to in-office work, is a respected Sales Administrator, and that Reiser values her contributions. [*Id.* at ¶¶ 186, 189].

## II.    PROCEDURAL HISTORY

On April 21, 2022, Plaintiff filed a Complaint in Norfolk Superior Court against the Company and Roger Reiser, President of the Company, individually and in his capacity as an officer, alleging only Counts I through IV. [Doc. No. 1-1]. Defendants removed Plaintiff's complaint to this Court on May 26, 2022. [Doc. No. 1]. On December 8, 2022, Plaintiff filed her First Amended Complaint, adding in Counts V-XIV. [Doc. No. 16]. On September 20, 2023, Judge Rya W. Zobel dismissed Roger Reiser from the action but denied the Company's Motion to Dismiss. [Doc. No. 32]. On January 26, 2024, Plaintiff filed a Second Amended Complaint bringing Counts I-XV against only the Defendant Company. [Doc. No. 42-1]. On July 8, 2024, Plaintiff dismissed, by stipulation, Counts I, III, and V, alleging violations of MEPA and EPA, and employment discrimination on the basis of sex under Chapter 151B. [Doc. No. 52]. Ms. McKeon also agreed to the partial dismissal of her employment discrimination and retaliation claims in Counts VII, VIII, IX and X to the extent they relate to Defendant's alleged failure to accommodate Ms. McKeon's dog as a service animal and threatening discipline thereto and any related retaliation claim. [*Id.*] The following 12 Counts remain:

1. Count II: Retaliation in violation of Massachusetts Equal Pay Act, M.G.L. c. 149 § 105A

2. Count IV: Retaliation in violation of Federal Equal Pay Act, 29 U.S.C. § 218c

3. Count VI: Retaliation on the basis of sex, in violation of M.G.L. c 151B, § 4

4. Count VII: Disability discrimination, in violation of M.G.L. c 151B, § 4

5. Count VIII: Retaliation on the basis of disability, in violation of M.G.L. c 151B, § 4

6. Count IX: Disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

7.  Count X: Retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203, *et seq.*

8.  Count XI: Violation of Massachusetts Paid Family and Medical Leave Act, M.G.L. c. 175M

9.  Count XII: Retaliation in violation of Paid Family and Medical Leave Act, M.G.L. c. 175M

10. Count XIII: Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

11. Count XIV: Discrimination in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

12. Count XV: Employment discrimination based on sexual harassment, M.G.L. c. 151B § 4

On July 31, 2024, the Company filed a Motion for Summary Judgment seeking dismissal of all of Plaintiff's remaining claims. [Doc. No. 53]. On September 13, 2024, Plaintiff filed a revised Opposition to Defendant's Motion. [Doc. No. 66-1]. Defendant filed its Reply on October 10, 2024, [Doc. No. 73], and a consolidated Local Rule 56.1 statement of material facts, [Doc. No. 74 ("SOF")], containing both parties' material facts and responses thereto. A hearing on Defendant's Motion was held on February 27, 2025. [Doc. No. 76].

## III.    LEGAL STANDARD

"Summary judgment is appropriate when the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). Once a party properly supports a motion for summary judgment, the opposing party "bears the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Lincare*, 989 F.3d at 157 (cleaned up).

In assessing whether a genuine dispute of material fact exists, courts "look to all of the record materials on file, including the pleadings, depositions, and affidavits," while "neither evaluat[ing] the credibility of witnesses nor weigh[ing] the evidence." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). The record must be examined, however, "in the light most favorable to the nonmovant[,] . . . drawing all reasonable inferences in that party's favor." *Lopez-Hernandez v. Terumo P.R. LLC*, 64 F.4th 22, 28 (1st Cir. 2023). And the Court "proceed[s] with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play." *Taite*, 999 F.3d at 93.

## IV.    ANALYSIS

Summary judgment is granted in favor of Reiser on all claims except for Ms. McKeon's hostile work environment claim. I understand that Ms. McKeon went through hardship during the period that she was caring for her mother and suffered mentally and emotionally herself because of that hardship. I also understand that over the nearly 12 years that Ms. McKeon has been an employee at Reiser, she has been committed to performing her responsibilities well, and Reiser has remained committed to retaining her as an employee. The record is replete with facts reflecting, and the parties agree, that Ms. McKeon is a "respected sales administrator" and that "Reiser values her contributions." Indeed, Ms. McKeon remains an employee at Reiser to this day. The facts here paint a picture of an employee that was struggling and a company that was doing its best to accommodate her while also balancing its own needs. But the facts simply do not paint a picture of disability discrimination, violations of leave laws, or retaliation. Given that nearly all the facts pertaining to these claims are undisputed, and the few facts that are disputed are largely immaterial, Ms. McKeon has not carried her burden of creating a triable issue of fact that should be heard by a jury on her disability discrimination claims, her Leave Act claims, or

her retaliation claims. However, I am not in a position to decide, as a matter of law, whether Ms.

McKeon was subject to a severe or pervasive and subjectively offensive conduct creating a

hostile work environment. That issue should be heard by a jury. Accordingly, Defendant's

Motion for Summary Judgment as to all claims is <u>GRANTED</u>, except for Plaintiff's sexual

harassment claim, to which summary judgment is <u>DENIED</u>.

## A.  <u>The Disability Discrimination & Retaliation Claims (Counts VII, VIII, IX, and X)</u>

### a.  **Ms. McKeon's Disability Discrimination Claims Under The ADA And Chapter 151B Must Be Dismissed**

Ms. McKeon alleges that Reiser discriminated against her based on her disability by (1)

refusing to grant her a reasonable accommodation for remote work, (2) forcing her to take

medical leave, (3) forcing her to use earned vacation and sick time, and (4) forcing her to work in

a common area rather than grant her a reasonable accommodation. *See* [Doc. No. 42-1 at ¶¶ 153-

157, 165-171]. For these reasons, Ms. McKeon alleges that Reiser violated Mass. Gen. Laws

Ann. ch. 151B, § 4(16) ("Chapter 151B, § 4") (Count VII) and the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12112, (Count IX). Both statutes prevent an employer from

discriminating against an employee on the basis of the employee's disability.

The ADA prohibits discrimination against a "qualified individual on the basis of

disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires," "on the basis of [that] disability." 42 U.S.C. §§

12111(8), 12112(a).

> "In order to establish a claim under the ADA, a plaintiff must prove the following
> three elements by a preponderance of the evidence: first, that she is disabled within
> the meaning of the ADA, i.e., that she has 'a physical or mental impairment that
> substantially limits one or more [ ] major life activities,' 42 U.S.C. § 12102(2);
> 'second, ... that with or without reasonable accommodation she was a qualified

individual able to perform the essential functions of the job; and third, ... that the employer discharged her because of her disability.'"

*Mulloy v. Acushnet Co.*, 460 F.3d 141, 145-46 (1st Cir. 2006) (omissions in original) (citing

*García–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000)).

Similarly, Chapter 151B, § 4, which "tracks the ADA in virtually all respects," *Mulloy*,

460 F.3d at 154, makes it unlawful for an employer to:

> [D]iscriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

Mass. Gen. Laws Ann. ch. 151B, § 4(16). To establish a claim for employment discrimination

under Chapter 151B, § 4, "a plaintiff must demonstrate the same three requirements as under the

ADA." *Mulloy*, 460 F.3d at 154 (cleaned up). In light of the similarities between the ADA and

Chapter 151B § 4, the "Supreme Judicial Court of Massachusetts has indicated that federal case

law construing the ADA should be followed in interpreting the Massachusetts disability law." *Id.*

(cleaned up). Accordingly, I will examine Ms. McKeon's disability discrimination claims under

the ADA, which will "apply with equal force to [Ms. McKeon's] claim under its state-law

counterpart, Mass. Gen. Laws. Ch. 151B, § 4." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d

11, 20 n. 5 (1st Cir. 2002).

Ms. McKeon's disability discrimination claims are based on Defendant's failure to

provide her with the following requested accommodations for Ms. McKeon's disability: (1) two

requests in March and April 2022 for full-time remote work; (2) a request for modified work

hours in June 2022; (3) a request for a hybrid in-person and remote work schedule in March

2023; and (4) an accommodation to cover the front desk from her own desk. The parties do not

dispute that Ms. McKeon had a disability within the meaning of the ADA. However, Ms.

McKeon has not met the second and third elements of the ADA.

### i.  Ms. McKeon Could Not Perform The Essential Functions Of Her Job With Her Requested Accommodation Of Remote Work

Under the ADA, "while the employer bears the burden of showing that a fought-over job

function is essential . . . the employee bears the burden of showing that she could perform that

function, even if only with some reasonable accommodation for her disability." *Lang v. Wal-*

*Mart Stores E., L.P.*, 813 F.3d 447, 454 (1st Cir. 2016). "An 'essential function' is a fundamental

job duty of the position at issue ... [it] does not include the marginal functions of the position."

*Mulloy*, 460 F.3d at 147 (alterations in original) (citing *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st

Cir. 2001)).

> Evidence of whether a particular function is essential includes, but is not limited to: '[t]he employer's judgment as to which functions are essential'; '[w]ritten job descriptions prepared before advertising or interviewing applicants for the job'; '[t]he work experience of past incumbents in the job'; and '[t]he current work experience of incumbents in similar jobs.'

*Id.* (alterations in original) (citing 29 C.F.R. § 1630.2(n)(3)).

"In the absence of evidence of discriminatory animus, we generally give substantial

weight to the employer's view of job requirements." *Id.* (cleaned up). An inquiry into the

essential functions is "not intended to second guess the employer or to require the employer to

lower company standards." *Id.* (citation omitted). I must "evaluate the essential functions of the

job without considering the effect of the special arrangements." *Phelps v. Optima Health, Inc.*,

251 F.3d 21, 25 (1st Cir. 2001). This means that, "[t]he fact that an employee might only be

assigned to certain aspects of a multi-task job does not necessarily mean that those tasks to which

she was not assigned are not essential." *Id.* at 26. Additionally, "evidence that accommodations

were made so that an employee could avoid a particular task merely shows the job could be restructured, not that [the function] was non-essential." *Id.* (alteration in original) (cleaned up).

Plaintiff argues that denial of her requests for remote work was unreasonable because she did not actually perform several of the duties that are in her job description, including "[f]iling and retrieving hard copies of documents in the office." [Doc. No. 66-1 at 16]. Plaintiff argues that "[n]obody had complained to McKeon about not getting files when she worked remotely" and that "[a]t least one other Sales Administrator worked a modified schedule and performed work from home." [*Id.*]. Defendant argues that it was an essential function of Ms. McKeon's job to "maintain and access, as needed, thousands of hard copy files, which required her physical presence in the office." [Doc. No. 54 at 14]. Defendant argues that "a critical part of Ms. McKeon's job was retrieving the contents of any one of thousands of Machine Files, preparing and filing hard copy White Sheets associated with equipment sales, and managing that information for the west coast sales team on an as needed basis." [*Id.*]. I agree with the Defendant.

Reiser has put forth ample evidence that Ms. McKeon's essential job functions required her to be in-person. Ms. McKeon's job description explicitly states, and she does not dispute, that the following are part of her job duties: "Retrieving and filing records, documents and reports"; "Create machine file and log into machine book"; "Printing and filing off all service tickets as they are approved"; "All general filing in the Canton office"; and "Answer phones for senior receptionist as needed." [Doc. No. 58-11; Doc. No. 58-12]. In response to Ms. McKeon's April 2022 accommodation request, Ms. Bray emphasized "Reiser's strong need to have [Ms. McKeon] and other Sales Administrators physically present in the office on a regular basis," and listed the "essential functions of a Sales Administrator." [Doc. No. 58-30]. Ms. Bray rejected the

25

request "because the essential functions" of Ms. McKeon's duties required her "to be physically present in the office." [*Id.*; Doc No. 74 at ¶¶ 78-80, 85]. The in-person needs of the job were emphasized to Ms. McKeon repeatedly with every subsequent request. For instance, in March 2023 when Ms. McKeon requested to work remotely on Wednesdays and Fridays, Mr. Serafin reiterated that "[t]he sales admin role is critical and needs to be done physically here in Canton." [Doc. No. 58-44]. Mr. Serafin has also testified that Reiser had "difficulty" when Ms. McKeon worked remotely because "there were days where [machine] files were not in the office." [Doc. No. 66-2-60, at Serafin Tr., 36:5-37:11]. Mr. Serafin would at times need to have other sales administrators cover for Ms. McKeon when she was out of office to fulfill her in-person duties. [*See* Doc. No. 66-2-60, at Serafin Tr. 20:19-21 ("[W]hen [Ms. McKeon] was out of the office, we would have to have some backup work done, so they would help out")].

The only evidence Ms. McKeon provides in support of her argument that she was not needed in person is that nobody complained to her regarding the machine files, that other sales administrators could pull files when needed, and that other sales administrators had remote work accommodations. The only evidence of other remote work accommodations in the record is that Penny Taylor, a Sales Administrator, currently works a reduced schedule, for reduced compensation, pursuant to which she does not work on Fridays. [Doc. No. 74 at ¶ 102]. On all other days, she works in the Canton office. [*Id.*]. Ms. McKeon does not dispute this. The type of schedule that Ms. Taylor has is not comparable to the remote work schedule that Ms. McKeon requested. Indeed, in providing Ms. McKeon with a modified work schedule after her leave ended in June 2022, in which she would work from 8:00 am to 4:30 pm with a 1-hour lunch break, Mr. Fontaine noted that "no other sales admin in any sales region has such a schedule." [Doc. No. 58-32]. Absent this evidence, Ms. McKeon's remaining evidence only supports that

the job could be restructured, not that the function was non-essential. *Phelps*, 251 F.3d at 25. Her self-serving arguments that "Defendant's emphasis on duties she had to perform in the office is exaggerated," [Doc. No. 66-1 at 12], is not supported by the record.

The fact that other Sales Administrators may also access machine files or other necessary hard copy files does not mean that Reiser was required to provide Ms. McKeon with her requested accommodation. *Kvorjak v. Maine*, 259 F.3d 48, 57 (1st Cir. 2001) (affirming summary judgment and holding that "[t]he law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous") (cleaned up). "Here, [Ms. McKeon] requests an accommodation which would prevent [her] from performing an essential function of [her] job, namely, being physically present at [Reiser]." *Mulloy*, 460 F.3d at 153; *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004) ("[A] request to work at home is unreasonable if it eliminates an essential function of the job"); *Phelps*, 251 F.3d at 26 ("Although a reasonable accommodation may include job restructuring, an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees." (cleaned up)).

I note that while there may be a dispute as to whether front desk coverage is an essential function of Ms. McKeon's job, she has not demonstrated that her request with respect to front desk coverage was denied "in whole or in part because of [her] disability." *Lang*, 813 F.3d at 458 (alteration in original); *compare* [Doc. No. 74 at at ¶ 230 (acknowledging that the front desk task is "minor"); *with* Doc. No. 58-38 ("Reiser needs to have regular coverage at the front desk, even if you don't agree with the necessity")].

### ii.  Ms. McKeon Has Not Demonstrated That Her Accommodation Requests Were Denied Due To Her Disability Or That Reiser's Stated Reasons For Denial Are A Pretext For Discriminatory Animus

Even if in-person work is not an essential function of Ms. McKeon's job—and I find that it largely is—Ms. McKeon has not demonstrated by a preponderance of evidence that Reiser's proffered reasons for rejecting her accommodation requests were pretext for discrimination. *Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 53-54 (1st Cir. 2019) (applying the *McDonnell Douglas* burden-shifting framework to claims under the ADA where there is no direct evidence of discriminatory animus, in which defendant bears the burden to articulate a non-discriminatory reason for denying an accommodation, after which the burden shifts back to plaintiff to show that the proffered reason for denial was pretextual).

Ms. McKeon argues that Reiser was always skeptical of her medical conditions. Ms. McKeon argues that Reiser's alternative offer to provide Ms. McKeon with a quiet location but making her find the location herself is evidence of discriminatory animus. [Doc. No. 66-1 at 16]. She also points to Reiser's insistence that she cover the front desk even though, according to her, Reiser should have known that her anxiety prevented her from sitting at the front desk due to her anxiety and agoraphobia. [*Id.*]. Specifically, when Ms. McKeon first objected to front desk coverage, Ms. Bray believed that the issue was one of sanitation. [Doc. No. 74 at ¶¶ 111-113]. When Ms. McKeon was again asked to cover one-hour shifts at the front desk in July 2022, Reiser indicated to Ms. McKeon that this was the first time that it was clearly communicated that her issues with front desk coverage were due to anxiety. [Doc. No. 58-38]. Ms. McKeon claims that this shows hostility toward her because Reiser received a medical report in April 2022 outlining her anxiety and agoraphobia, Ms. McKeon allegedly told human resources repeatedly

that she had issues working in shared workplaces due to her anxiety, and she had a massive anxiety attack on July 20, 2022. [Doc. No. 66-1 at 16-17].

Nothing in the record supports that Reiser had any hostility toward Ms. McKeon's disability. In fact, the record overwhelmingly shows that Reiser repeatedly expressed empathy for Ms. McKeon and tried to offer her an accommodation, even if it was not the accommodation she wanted, at every turn. [*See, e.g.* Doc. No. 58-37 (in response to Ms. McKeon's anxiety attack and her offer to take the rest of the week off as vacation time: "I understand completely. I think it would be best for you to take the rest of the week off as vacation time, to relax and find any additional comfort you are able"); Doc. No. 58-38 (in response to Ms. McKeon's opposition to front desk coverage: "Could you offer any other proposed accommodation that might allow you to do that job from the front desk?" and "[w]e would like to accommodate if we reasonably can"); Doc. No. 58-32 (offering an alternative accommodation despite the accommodation "creat[ing] a hardship for the department in the west coast territory")]. Ms. McKeon simply has not put forth sufficient evidence to demonstrate that denial of her requested accommodations were based on hostility toward her disability. *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 113 (1st Cir. 2024) ("It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination") (cleaned up).

Reiser even attempted to engage an interactive process with Ms. McKeon, but she did not engage. Although the Equal Employment Opportunity Commission "regulations that implement the ADA do not mandate that an employer provide an interactive process, they do suggest that 'it may be necessary for the covered entity to initiate an informal, interactive process with the

qualified individual,' 29 C.F.R. § 1630.2(o)(iii)." *Phelps*, 251 F.3d at 27 (citation omitted). Here, Reiser offered Ms. McKeon alternative accommodations in lieu of full-time remote work, including allowing Ms. McKeon, an employee of nearly 12 years familiar with the office space, to find a workplace suitable to her needs, providing Ms. McKeon with noise canceling headphones, and proposing alternative schedules. Ms. McKeon did not follow up to discuss those options. [Doc. No. 74 at ¶ 87]. Ms. McKeon's allegations that she was not afforded the benefit of an interactive process thus do not have merit. *Phelps*, 251 F.3d at 27-28 (denying liability where plaintiff failed to cooperate in an interactive process); *see also Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311-312 (3d Cir. 1999) (both parties have duty to engage in interactive process in good faith); *Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135–37 (7th Cir. 1996) (employee's unwillingness to cooperate in interactive process prevents them from premising liability on its failure).

### b.  Ms. McKeon's Disability Retaliation Claims Must Be Dismissed

Ms. McKeon alleges that Reiser retaliated against her for requesting reasonable accommodations by (1) forcing her out of the workplace so she would have to use medical leave, (2) charging her sick and vacation time while she was out of work on forced medical leave so that she would have no time left, (3) denying her leave, (4) threatening her with disciplinary action, and (5) summarily denying her accommodation requests after she filed an MCAD Complaint. [*See* Doc. No. 42-1 at ¶¶ 158-164 (Count VIII), 172-178 (Count X)].

To establish a prima facie retaliation claim, Ms. McKeon must show that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Rios*, 106 F.4th at 118. Neither party disputes that Ms. McKeon engaged in protected activity by

requesting reasonable accommodations. However, Ms. McKeon has not met her burden of showing that any adverse actions were taken against her or any evidence of pretext. *Crevier v. Town of Spencer*, 600 F. Supp. 2d 242, 260 (D. Mass. 2008) ("The *McDonnell-Douglas* burden-shifting framework generally applies to both discrimination and retaliation claims under the ADA").

The essence of Ms. McKeon's disability retaliation claim is that "[b]y denying her accommodation request, Defendant forced Ms. McKeon to use up all of her medical leave, so her options in June 2022 were to return to work without an accommodation or leave the job." [Doc. No. 66-1 at 11-12]. Plaintiff's accusations that she was forced to take leave are directly contradicted by her own statements in the record.

First, the record shows that after her hybrid work arrangement ended in December 2021, Ms. McKeon was "perfectly happy" to use medical leave for her own medical condition beginning in January 2022. [*See* Doc. No. 58-56, at Pl. Tr. Vol. II 46:1-11 ("Q: So, at this point in time in December of 2021, your testimony is that, at this time, you're prepared to actually use intermittent FMLA and PFML? A: That is true. That is true, yes. Q: So you weren't angry about that? A: No. No,"); 47:2-8 ("Q: Just to be clear, you were perfectly happy to use your leave time beginning in January of 2022. That is your testimony? A: I believe so, yes")]. This leave was taken before Ms. McKeon's first accommodation request was made in March 2022. Additionally, Ms. McKeon has testified that she wanted to take continuous medical leave from February 2022 to June 2022 as she felt it was "necessary" for her own medical condition. [Doc. No. 74 at ¶¶ 62-63; Doc. No. 58-56, Pl. Tr. Vol. II 89:7-13]. Following the rejection of her remote work request, Ms. McKeon still followed up about taking leave in May 2022, and Reiser never once prevented her from taking that leave or any other leave. [Doc. No. 74 at ¶ 93].

Second, Ms. McKeon was never forced by Reiser to use sick and vacation time so that she would have "no leave time left." [Doc. No. 42-1 at ¶¶ 160, 174]. Rather, Ms. McKeon does not, and cannot, dispute that supplementing her leave time with earned sick and vacation time so that she could earn 100% of her pay while on leave was exactly what Ms. McKeon wanted. [Doc. No. 58-56, at Pl. Tr. Vol. II 49:1-5 ("Q: So you were okay with applying paid sick or vacation time to supplement your weekly benefit; is that right? A: I was, yes"); Doc. No. 74 at ¶¶ 64, 92].

Third, Ms. McKeon argues that "[o]nce she had no leave, defendant could deny time off, paid or unpaid, and threaten her with discipline for any absence, which it did." [Doc. No. 66-1 at 12]. It is already established that Ms. McKeon used up her leave of her own choosing. Plaintiff cites to no authority holding that denying her time off when she has no time off left to take, constitutes an adverse action impacting her job. *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002) ("We have explained that adverse employment actions include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees") (cleaned up).

Further, to the extent that the written disciplines Ms. McKeon received may constitute an adverse action, Reiser clearly had a legitimate, non-discriminatory reason for giving those disciplines when Ms. McKeon took an explicitly unauthorized day off and left work early without permission. Ms. McKeon acknowledged that she could have asked Mr. Serafin for time off sooner and understood that she was supposed to give as much notice as possible for requested time off. [Doc. No. 74 at ¶ 175]. Ms. McKeon also does not dispute that she left work early without asking Mr. Serafin's permission, and that she was aware that she reported to Mr. Serafin and needed his permission to leave early. [*Id.* at ¶ 182]. She also does not dispute that she does

not have authority to unilaterally change her work schedule or take vacation time. [*Id.* at ¶ 183]. As Ms. McKeon has not presented any evidence of pretext, I find that "the employer believed its stated reason to be credible." *Rios*, 106 F.4th at 113. Having presented no other evidence of an adverse action, Ms. McKeon's disability retaliation claim must be dismissed.

This is an unusual case in which Ms. McKeon was never fired or demoted, as is typically the case with disability discrimination or retaliation claims. *See, e.g., Id.* ("Termination . . . is of course the quintessential adverse employment action"); *see also Lang*, 813 F.3d at 450. Ms. McKeon remains employed with Reiser to this day, has "performed her job capably since returning to in-office work," [Doc. No. 74 at ¶ 186], is a "respected Sales Administrator and Reiser values her contributions," [*id.* at ¶ 189], has never been demoted, never had her pay reduced, and never had her job responsibilities change. [*See* Mot. H'rg Draft Tr. 02/27/2025 at 14:20-23]. For all these reasons, Ms. McKeon's disability discrimination and retaliation claims are dismissed.

## B. <u>The PFMLA & FMLA Claims ("Leave Act claims") (Counts XI, XII, XIII, XIV)</u>

Plaintiff has effectively conceded dismissal of its direct Leave Act claims and fails to create a triable issue of fact regarding her retaliation claims under the PFMLA and the FMLA.

First, Plaintiff alleges that Defendant violated the PFMLA by (1) denying her request for intermittent leave to care for her mother and instead forced her to use all her job-protected leave under the law, and (2) charging her sick time and vacation time while she was out of work on protected leave under the PFMLA. [*See* Doc. No. 42-1 at ¶¶ 179-185 (Count XI)]. Plaintiff alleges that she is entitled to a presumption of retaliation under the PFMLA because Defendant (1) retroactively deducted all of her earned sick and vacation time for the period when she was on medical leave under the PFMLA, (2) denied all of her requests for leave as a result of

unlawfully charging her earned time while she was on medical leave and incorrectly calculating her used leave, and (3) threatened disciplinary action against her if she took leave. [*See id.* at ¶¶ 186-190 (Count XII)].

Second, Plaintiff alleges that defendant violated the FMLA by (1) denying intermittent leave, (2) by notifying her in September 2022 that it was deducting leave from her account for the period she was on FMLA leave, and (3) by telling her she would face disciplinary action if she had any further absences from the workplace because her earned leave was exhausted. [*See id.* at ¶¶ 191-199 (Count XIII)]. Plaintiff also alleges that Defendant retaliated against her in violation of the FMLA by (1) notifying her in September 2022 that it was deducting paid leave for FMLA leave that had ended in June 2022, and (2) threatening her with disciplinary action. [*See id.* at ¶¶ 200-204 (Count XIV)].

The FMLA provides eligible employees with "the right to take twelve weeks of leave during any twelve-month period because the employee has a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Rousseau v. Clark Univ.*, No. 22-cv-40118, 2023 WL 3435570, at *2 (D. Mass. May 12, 2023) (cleaned up). Under the FMLA, an employee may also take leave to care for a family member with a serious health condition. *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 718 (1st Cir. 2014). The FMLA makes it unlawful for any employer to "(1) interfere with, restrain, or deny the exercise' of any FMLA right; or (2) retaliate or discriminate against employees . . . who have used FMLA leave." *Rousseau*, 2023 WL 3435570, at *2 (quoting *Carrero-Ojeda*, 755 F.3d at 718); *see also* 29 U.S.C. § 2615. Similarly, the PFMLA makes it unlawful for any employer to "retaliate by discharging, firing, suspending, expelling, disciplining, through the application of attendance policies or otherwise, threatening or in any other manner discriminating against an

employee for exercising any right to which such employee is entitled . . . or with the purpose of interfering with the exercise of any right to which such employee is entitled." Mass. Gen. Laws Ann. ch. 175M, § 9.

Thus, under the PFMLA and the FMLA, violations can occur when an employer either (i) interferes with an employee's exercise of their rights under these statutes, or (ii) retaliates against an employee who has exercised their rights under these statutes. To establish a prima facie case of interference, a plaintiff must establish that:

> (1) [S]he was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer notice of her intention to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.

*Rousseau*, 2023 WL 3435570, at *2 (citation omitted). To state a claim for retaliation, Plaintiff must plausibly plead that:

> (1) [S]he availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between her protected conduct and the adverse employment action.

*Id.* at *4 (citation omitted). As an initial matter, Plaintiff's claims are dismissed to the extent that Plaintiff has conceded that no requested leave under the FMLA or the PFMLA was ever denied. As a refresher, Ms. McKeon worked a hybrid schedule from September 2021 to December 2021. This schedule was not considered "leave" under the FMLA or PFMLA to take care of Ms. McKeon's mother because Ms. McKeon specifically stated that taking leave under the FMLA was not a good option. [*See* Doc. No. 74 at ¶¶ 44, 210]. Ms. McKeon does not dispute that this hybrid arrangement was temporary and ended on December 13, 2021. [*Id.* at ¶ 47]. Afterward, Ms. McKeon was approved for intermittent leave to care for her mother under the FMLA and PFMLA in January 2022 but began taking continuous leave for her own medical condition from February 2022 to June 2022. [*Id.* at ¶¶ 56-59, 61-63]. Ms. McKeon does not dispute that from

January 2022 to the present, she was never denied requested leave under the FMLA or PFMLA. [*Id.* at ¶ 57; *see also* Doc. No. 66-1 at 11 ("[Plaintiff] began intermittent leave, which became full-time leave from March to June 2022"); [Mot. H'rg Draft Tr. 02/27/2025 at 13:3-8 ("she was granted time")]. Because Ms. McKeon "received all her requested leaves," *Kleya v. Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 104 (D. Mass. 2019), she has failed to demonstrate a violation of either the FMLA or PFMLA.

There is also undisputed evidence that Ms. McKeon was proactively informed multiple times that sick and vacation time could be used to supplement her income while on leave, which is exactly what Ms. McKeon wanted. [*See* Doc. No. 74 at ¶ 41; ¶ 92; Doc. No. 58-56, at Pl. Tr. Vol. II 49:2-5 ("Q: So you were okay with applying paid sick or vacation time to supplement your weekly benefit; is that right? A: I was, yes")]. Ms. McKeon does not argue that the PFMLA prohibits supplementing leave benefits with paid time off, and the FMLA allows an employer to "require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee … for any part of the 12-week period of such leave." 29 U.S.C. § 2612(d)(2)(A). Thus, Ms. McKeon's arguments that Reiser unlawfully or improperly charged her sick or vacation time during her leave to support her Leave Act claims, fails, either as interference or retaliation.

What remains of her Leave Act claims fare no better.[5] Ms. McKeon complains that Reiser belatedly made adjustments in the software it used to calculate her sick and leave time. Following an error that impacted all Reiser employees who took leave in 2022, Ms. McKeon was informed that she had exceeded her accrued allotment of eligible time off by 8.4 days. [Doc. No. 74 at ¶ 134]. Reiser did not seek restitution for the overpayment relative to the 8.4 days, and Ms.

---

[5] Ms. McKeon's allegations that she was threatened with disciplinary action as a result of taking leave fail for largely the same reasons listed in Section A.a.i, *supra*.

McKeon agrees that the amount of time ultimately deducted from McKeon's sick and vacation time relative to her leave was correct. [*Id.* at ¶¶ 135-136]. For the purposes of retaliation under the FMLA, an adverse action typically involves "discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Gregg v. Ne. Univ.*, 743 F. Supp. 3d 257, 277 (D. Mass. 2024). Ms. McKeon has not put forth sufficient evidence to demonstrate that Reiser's software error impacting all employees who took leave the same year is an action that a "reasonable employee would find to be materially adverse in the sense that" it "would dissuade the employee from taking FMLA leave," especially considering that Reiser did not seek restitution relative to its error. *Id.* at 278 (citation omitted). Nor has Ms. McKeon argued or provided evidence to support that Reiser's proffered reason for the error was pretext for discrimination. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998).

For these reasons, Counts XI, XII, XIII, XIV pertaining to Ms. McKeon's Leave Act claims are dismissed.

### C.  The Remaining Retaliation Claims (Counts II, IV, and VI)

Plaintiff voluntarily dismissed her EPA, MEPA, and Chapter 151B claims arising from equal pay act claims, [*see* Doc. No. 52], but her retaliation allegations relating to those dismissed claims remain. [*See* Doc. No. 42-1 at ¶¶ 124-127 (Count II), 137-140 (Count IV), 146-152 (Count VI)]. Ms. McKeon first raised issues of unequal pay to Reiser in November 2019 and then again in December 2021. [Doc. No. 74 at ¶¶ 24, 55]. On February 23, 2022, Ms. McKeon filed an MCAD complaint addressing her sex-based discrimination and retaliation claims relative to her claims of unequal compensation. [*Id.* at ¶ 66]. On April 21, 2022, Ms. McKeon filed the instant lawsuit setting forth the allegations in Counts I-IV. [*Id.* at ¶ 88].

Plaintiff takes a "kitchen-sink" approach to almost all of the allegations in support of her retaliation claim and fails to provide any evidence in support of many of these allegations. For example, Ms. McKeon argues that Reiser retaliated against her by: refusing to allow her to apply for a Regional Manager position, failing to provide her training that was provided to male employees, failing to investigate her complaints, denying promotional opportunities, changing her work schedule, forcing her to use leave, removing access to information, modifying her access to calendar information, summarily denying all of her disability accommodation requests, forcing her out of the workplace so she would have to use medical leave, charging her earned sick and vacation time while she was out of work on forced medical leave so she would have no time left, denying her with leave, threatening her with disciplinary action, and "taking other retaliatory actions against her in the workplace." [*See* Doc. No. 42-1 at ¶¶ 126, 139, 148-149]. But Plaintiff does not provide evidentiary support for her retaliation allegations that go to the merits of her now-dismissed unequal pay claims, i.e., her allegations that she was denied promotional opportunities, denied training, and that Reiser failed to investigate her claims. Additionally, Plaintiff's unequal pay retaliation claims are dependent on the same allegations supporting her Leave Act retaliation claims and her disability discrimination/retaliation claims, i.e., that she was denied accommodations and "forced" to take leave. All these allegations lack evidentiary support and fail for the reasons already explained.

What remains are Plaintiff's arguments that following the filing of this lawsuit, Mr. Serafin removed her access to his personal calendar and removed her access to an old sales tracker spreadsheet. These actions do not constitute adverse actions. First, the timing of Ms. McKeon's claim that her access to Mr. Serafin's calendar was removed following her lawsuit is suspect. Ms. McKeon does not dispute that Mr. Serafin took away full access to his calendar

"sometime after she filed her lawsuit" in April 2022. [Doc. No. 74 at ¶ 89]. But in Ms.

McKeon's MCAD Complaint filed in February 2022, two months prior to when she filed this

suit, there is a paragraph that states that "Mr. Serafin also modified [Ms. McKeon's] access to his

calendar, which [Ms. McKeon] had been able to fully access since he started with the company

in July 2019." [Doc. No. 58-24, at ¶ 27]. While this could be a claim of retaliation in response to

Ms. McKeon's letters outlining equal pay issues in November 2019 and December 2021, the

timing of when her calendar access was removed is not specified anywhere in the record tends to

undermine her retaliation claim.

Second, and more importantly, the loss of access to Mr. Serafin's personal calendar does

not constitute an adverse action. "An adverse employment action is one that materially changes

the conditions of a plaintiff's employment." *Desai v. Univ. of Mass. Mem'l Med. Ctr.*, 605 F.

Supp. 3d 255, 267 (D. Mass. 2022). Ms. McKeon does not dispute that the calendar that she lost

access to was Mr. Serafin's personal calendar where he set up his own business meetings. [Doc.

No. 74 at ¶ 90]. Plaintiff concedes that her removed access to Mr. Serafin's calendar did not

impact her ability to do her work. [*Id.* at ¶ 90; *See* Mot. H'rg Draft Tr. 02/27/2025 at 22:3-6].

The same is true of her lost access to a spreadsheet that her original supervisor used to track

sales. Ms. McKeon testified that Mr. Serafin used a different process to track sales and has not

otherwise alleged that her loss of access to this spreadsheet impacted her job. [*See* Doc. No. 74 at

¶ 197; *see also* Mot. H'rg Draft Tr. 02/27/2025 at 38:16-24].

Plaintiff relies on the Supreme Court's holding in *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 64 (2006) to argue that retaliation "is not limited to discriminatory actions

that affect the terms and conditions" of her job. Ms. McKeon argues that these actions had a

chilling effect because "[a]ll other sales administrators had access to their Regional Managers'

calendars." [Doc. No. 66-1 at 8]. Even if retaliation is not limited to actions that solely impact Ms. McKeon's job, Ms. McKeon has not shown any other evidence that such actions would "tend to dissuade a reasonable worker from making or supporting a charge of job discrimination." *Burlington*, 548 U.S. at 57. As such, Counts II, IV, and VI are dismissed.

D. **The Hostile Work Environment/Sexual Harassment Claim (Count XV)**

Plaintiff's strongest claim capable of surviving summary judgment is that she was subject to a hostile work environment amounting to sexual harassment in violation of Chapter 151B, § 4. Her hostile work environment claim is based on two incidents. The first, was when she was asked to participate in a birthday card for Mr. Reiser in which female employees' faces would be pasted onto pictures of women in bathing suits to be displayed on a large poster board in Mr. Reiser's office for his 80th birthday. [*See* Doc. No. 74 at ¶¶ 146-147]. The second, was when Reiser employees attending a summer sales meeting in July 2023 were asked to wear a "Camel Toe Burger" t-shirt that referenced an inuendo pertaining to the female body. [*Id.* at ¶¶ 158-159, 241-243].

Defendant argues that these two isolated incidents are not so "severe or pervasive to alter McKeon's work environment." [Doc. No. 54 at 19]. Defendant further argues that Ms. McKeon herself may not have found these incidents to be subjectively offensive because she had participated in similar cards in the past, and her "sudden displeasure" should be viewed "as an attempt to manufacture a claim that does not exist." [*Id.* at 20]. Plaintiff argues that the birthday poster and t-shirt both represent an objectification of women's bodies, she was directly exposed to the poster and the t-shirt, and there was a general atmosphere of hostility toward women in a company where leadership is largely, if not exclusively, male. [Doc. No. 66-1 at 18-20]. I agree.

Under Chapter 151B, § 1, sexual harassment is defined as "verbal or physical conduct of a sexual nature when" such conduct has "the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass. Gen. Laws Ann. ch. 151B, § 1(18). A hostile work environment is one "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, pos[ing] a formidable barrier to the full participation of an individual in the workplace." *Romero v. McCormick & Schmick Rest. Corp.*, 448 F. Supp. 3d 1, 4 (D. Mass. 2020) (citation omitted). Plaintiff must demonstrate that the harassment was "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment," and that the "sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 320 (1st Cir. 2014) (citation omitted); *see also id.* at 319 n. 9 (acknowledging that the same legal standard applies to claims for hostile work environment brought under both federal and state law).

Defendant argues that these two isolated incidents do not amount to "severe or pervasive" conduct. "There is no numerosity requirement that a plaintiff must meet to establish a hostile work environment." *Romero*, 448 F. Supp. 3d at 5. While Defendant characterizes these incidents as "isolated," the record suggests that Mr. Reiser, the company's CEO, requested the birthday cards in the past and that HR had previously asked that the company to stop making the cards. [Doc. No. 58-54, at Pl. Tr. Vol I, 26:11-21 ("We're going to put it on the bodies of swimsuit models, as we always have"); 27:15-18 ("Fran said that Roger had been approached by Helen Graham. Helen wanted to have a cocktail party at her house for Roger's 80th birthday, and

Roger said, all I want is one of my cards"); 31:20-24; 32:1-6]. Further, this was not a 5x7 inch birthday card that can only be viewed up close. This was a large poster board that was hung up in Mr. Reiser's all-glass office, viewable by anyone who passed by. [*See* Doc. No. 66-2-63]. Ms. McKeon saw the birthday poster while putting machine files away outside of Mr. Reiser's office. [Doc. No. 74 at ¶ 238]. Given that Ms. McKeon and other employees would be exposed to this poster, I find that Ms. McKeon has created a triable issue of fact as to whether the poster's frequency, nature, size, and location created a severe or pervasive environment that would interfere with Ms. McKeon's work.[6]

Defendant also argues that no reasonable person would view the "silly, hand-made card of employees' heads on magazine cutouts" as objectively offensive. I disagree. *See Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1036 n. 28 (D. Mass. 1995) ("The pervasive use of insulting and demeaning terms relative to women in general may serve as evidence of a hostile environment"). Defendant cites to several cases that have granted summary judgment in favor of an employer for conduct that Defendant argues is far worse than the conduct here. *See, e.g., Thompson v. Coca-Cola Co.*, 522 F.3d 168, 173, 179-180 (1st Cir. 2008) (multiple explicitly racist comments held not to amount to "pervasive" harassment); *Rivera-Martinez v. Commonwealth of Puerto Rico*, No. 05-2605, 2007 WL 16069, at *1, 3 (1st Cir. Jan. 4, 2007) (two incidents where plaintiff alleges she was inappropriately touched did not constitute "pervasive" harassment); *Prader v. Leading Edge Prods., Inc.*, 39 Mass. App. Ct. 616, 619-620 (1996) (sexually explicit comments, including use of the word "c***sucker," resulting in a "culture of profanity," were not a form of sexual harassment). Given the advances that we have made as a society to make workplaces safer for women, I do not believe that I am bound by

---

[6] The same is true of the t-shirt, which Reiser employees who attended the summer sales meeting were expected to wear. [Doc. No. 74 at ¶ 243].

standards that may have been acceptable 30, 20, or even 10 years ago. In 2025, a jury may very well find that a CEO of a company who displays his female employees' faces on the bodies of scantily clad women for the entire office to see, and a t-shirt that references the outline of a female vagina, encourages a culture that approves of the objectification of women's bodies. *See, e.g. Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017) (a defendant's "general attitude of disrespect toward his female employees, and his sexual objectification of them," can be actionable); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111 (2d Cir. 2013) ("Even a single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [may] be actionable") (citation omitted); *Miller v. Wash. Workplace, Inc.*, 298 F. Supp. 2d 364, 374 (E.D. Va. 2004) (permitting hostile work environment claim to go forward under Title VII where "all of the allegedly harassing comments involve the objectification of women"). Though Ms. McKeon's claim may not succeed on the merits, I am not prepared to decide as a matter of law that her claim cannot survive summary judgment.[7]

## V.    CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment is <u>GRANTED</u>, in part, as to Counts II, IV, VI, VII-XIV, and <u>DENIED</u> as to Count XV.

---

[7] At the hearing, there was some discussion as to whether Ms. McKeon herself found the poster and the t-shirt to be subjectively offensive. Defendant argues that because Ms. McKeon participated in the poster in the past, took a picture of the poster, signed the poster, took home a "camel toe" t-shirt, and did not complain to HR regarding the poster or the t-shirt, she did not find the poster or the t-shirt offensive. Ms. McKeon puts forth evidence that she would not want her daughter participating in this type of activity, and that she found the t-shirt to be tasteless. [*See* Doc. No. 58-54, at Pl. Tr. Vol. I at 35:22-36:1 ("Q: Is it your testimony that when the card was created in August of 2024, that was offensive to you? A: To me, yes, at that time, it was offensive")]. Given that Ms. McKeon has put forth enough evidence to demonstrate a culture of objectification, a jury may find that Ms. McKeon felt pressured to participate in the culture at Reiser and may not have wanted to rock the boat at Reiser. I find these disputed facts sufficient to create a triable issue for a jury to decide whether the subjectivity element has been met.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge